FILED & ENTERED

JAN 07 2015

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Gonzalez DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

In re:

Robert Vilas Johnson
Linda Joyce Johnson

Debtor(s).

Case No.: 1:11-bk-18629-GM

CHAPTER 11

**MEMORANDUM OF DECISION ON STATUTE OF LIMITATION AND DERIVATIVE NATURE OF CLAIM ISSUES ON THE TRUSTEE'S OBJECTION TO PROOF OF CLAIM 14-1 OF DREW KAPLAN**

Date:   December 1, 2014
Time:   10:00 a.m.
Courtroom:  303

On July 18, 2011, Robert Johnson filed this case under chapter 11.  At that time he and Drew Kaplan were each a 50 percent owner in Internet Specialties West, Inc. ("IS West").  On November 14, 2012, Jeffrey Golden was appointed as trustee in this case (the "Trustee").  The Trustee has filed a proposed disclosure statement, but that has not yet been approved and an amended one is to be filed in the near future.

On December 18, 2012, Drew Kaplan and Jeffrey Golden filed a chapter 11 case for IS West (1:12-bk-20897-GM).  IS West has since been sold, a plan was confirmed,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and a final decree has been entered. Once all creditors of IS West were paid, Kaplan

received half of the remaining balance and Golden, as chapter 11 trustee of the

Johnson estate, retained the other half.

On October 22, 2013 Kaplan filed proof of claim 14-1 in this case (the "POC")

seeking $8.6 million as "damages and loss of value of shares and investment in IS

West." Attached to the POC is the adversary complaint (1:11-ap-01679) which Kaplan

had filed under 11 U.S.C. §523 against Johnson on December 29, 2011. In summary,

the basis of the adversary complaint is as follows:

In 1995 Johnson induced Cleveland and Bickley to invest $75,000 in

Interactive Strategies, Inc. (ISI) to be used to develop and implement a business

enterprise by the name of Central Connection. Later, Johnson told Cleveland

and Bickley that Central Connection had gone out of business, but actually the

business and assets of Central Connection were transferred into IS West,

thereby defrauding Cleveland and Bickley.

After this happened, in November 1997 Kaplan acquired a 20 percent

interest in IS West and by November 1998 he was a 50 percent shareholder. At

no time before this did Johnson tell Kaplan about his dealings with Cleveland and

Bickley. However, in December 2005, Kaplan received a copy of the complaint

filed by Cleveland and Bickley against ISI, IS West, Johnson and others.[1]

Johnson told Kaplan that the lawsuit would not be a problem and that he

personally would pay for the handling of the lawsuit. Johnson led Kaplan to

believe that the lawsuit was not a significant issue for IS West and Johnson

intentionally prevented Kaplan from learning or discovering the nature of the

---

[1] Date added by the Court since it is not specified in the complaint. Also, as noted later in this memorandum, there were no other defendants named in the complaint.

lawsuit or its magnitude.  In fact, Johnson caused IS West to pay and incur over $1.1 million in fees and defense costs.  In mid-November 2010, Johnson stopped paying the litigation costs, so Kaplan had to agree that IS West would pay no more than $40,000 of these costs. On March 25, 2011, Cleveland and Bickley received a judgment against Johnson and IS West in the amount in excess of $4 million.

On January 6, 2014, the Trustee filed his objection to the Kaplan POC (dkt. 196). The Court bifurcated the issues in order to first determine when the statute of limitations ended and whether the claims asserted by Kaplan are derivative and therefore cannot be enforced against the estate.  The evidentiary hearing on these two issues commenced on November 18, 2014 at which time argument was made and Kaplan testified.  The hearing was continued to December 1, 2014 so that Johnson could testify.  On December 1, 2014, Kaplan filed a notice that he consented to the subordination of POC #14 and that the claim was amended to reflect the subordination (dkt. 350).

Even with the subordination, due to tax issues, other possible assets, and various other matters that have not yet been resolved, the Trustee reports that at this time it is unknown whether this will be a surplus estate.


**LIMITED FACTUAL FINDINGS**

Because of the bifurcated nature of these proceedings, the Court only needs to make limited factual findings regarding the issues of statute of limitations and the derivative nature of Kaplan's claim.  The Court is not – at this time – determining other issues, such as intent to defraud.

There are three theories included in the adversary complaint attached to the POC: (1) fraudulent concealment at the time that Kaplan became an interest-holder and/or increased his ownership interest in IS West; (2) breach of fiduciary duty to Kaplan as a co-owner of the corporation, and (3) a fraudulent promise in December 2005 by Johnson that he would cover all of the costs of the Cleveland/Bickley suit and any judgment that resulted. To some extent it appears that Kaplan is also requesting declaratory relief and an accounting of the reduction of his interest in IS West based on these theories.

Basically the facts are not is dispute. Both Johnson and Kaplan testified that they spoke at length shortly after Johnson gave Kaplan the complaint in December 2005. Both agree that Kaplan wrote out a list of questions, which they went over in that conversation and a copy of which was given to Johnson, who produced it in discovery for this case. Both identified exhibit 101 as the document that Kaplan created. Kaplan's questions delve into the relation of Johnson, ISI, Central Connection, and Cleveland and Bickley. Specifically, the list reads as follows:

1. Why did ISI take $75K from these people? Was it really to start Central Connections? And or some other venture?
2. When did you tell these people that Central Connections was losing too much money and that you shut it down?
3. When did you shut Central Connections down?
4. Did you B.K. ISI?
5. Were these people named in the B.K.?
6. Were any of the DBA's named in the B.K.?
7. What are Plaintiff's [*sic*] referring to selling software packages?
8. When did ISWest incorporate?
9. When did ISWest make it's [*sic*] first $1?
10. Who owned ISWest originally?
11. Who ran ISWest originally?
12. When did Bob Johnson become President of ISWest?
13. When did ISI close it's [*sic*] doors?
14. What did ISWest do and what did Central Connections do for Internet?
15. Page 4, line 1, number 13, date is incorrect.

> Note: ISWest is a totally separate venture and had nothing to do with Central Connections. Central Connections was shut down and closed in 1996, several months before ISWest was incorporate [*sic*]. ISWest didn't start selling Internet Service until 1997. Plaintiff is going after the wrong company because they see that Robert Johnson is the president. Robert didn't become president until sometime in 1998.
>
> It is important to get the heat off ISWest and on to ISI/Robert Johnson. If a settlement is made, ISWest must be excluded from any payment. All settlement payments shall come from Robert Johnson or ISI.[2]

There is some inconsistency in their testimony concerning what Johnson said to Kaplan as to the possible liability of IS West and who would bear the cost. Kaplan testified that Johnson said that if there was any settlement or burden on IS West, it would come out of Johnson's share of IS West. Kaplan understood this to mean that Johnson would pay the legal fees and any settlement or judgment. But Kaplan did not testify that Johnson had actually said that in so many words. He only quoted Johnson as saying: "I'll take care of it."

Johnson is more specific that the conversations began in December 2005, but continued over time. Johnson testified that in 2005 when he said to Kaplan that he [Johnson] would "take care of it," he meant that he would handle it. It did not seem major and he had already consulted with counsel who had told him that the lawsuit would go away. Johnson was adamant in his testimony that he never made an open-ended promise guaranteeing that he would pay for everything and that IS West would not be liable.

During cross examination, Johnson gave a broader view than Kaplan had given of that first substantive meeting with Kaplan after the receipt of the complaint. He stated that Kaplan was very upset and that he [Johnson] was responding in a conciliatory

---

[2] Exhibit 101, contained in Trustee's exhibit book I, §28.

fashion.  Up to this time, he and Kaplan had been like brothers, but that ended when the complaint arrived.  Johnson testified that he told Kaplan that he would take care of the matter to the best of his ability.  Although Kaplan was adamant that Johnson must take care of it and pay all of the attorney's fees – asserting that it had nothing to do with IS West – Johnson only offered to take care of it for as long as he could do so and he said this to Kaplan.  Johnson testified that he used statements like, "let's see where this goes," "I will handle it," and "I don't know where this is going to go."[3]

According to Kaplan, during the early part of the lawsuit he [Kaplan] thought that the worst case scenario was that Cleveland and Bickley might recover the $75,000 that they had invested in ISI, plus interest. Kaplan testified that he trusted Johnson and, because there were a lot of other defendants, he never turned the suit over to corporate counsel and did not seek advice from corporate counsel.[4]  However, had Johnson refused to take responsibility for the fees and damages, Kaplan said that he would have turned it over to corporate counsel.

At first the lawsuit seemed likely to be derailed before a trial.  There were several successful demurrers and then the defendants prevailed on a motion for summary judgment as to the statute of limitations.  Johnson testified that in April 2009, when the Court of Appeal reversed the summary judgment, the defendants changed attorneys. [5] At that time Johnson went to Kaplan and asked that IS West pick up part of the costs, asserting that he was now out of money.  According to Johnson, Kaplan refused and completely walked away from any voluntary involvement in the case.

---

[3] Johnson testimony, 12/1/14 at 3:16 p.m.

[4] Kaplan testified that the Cleveland/Bickley lawsuit had lots of defendants, but in actuality there were only three defendants: ISI, IS West, and Johnson.  LASC Case No. 073219 (copy of proposed third amended complaint, confirmed by case summary at http://www.lacourt.org/casesummary/ui/casesummary.aspx?).

[5] The Court takes judicial notice that the summary judgment was reversed and the case was remanded to the trial court on April 23, 2009.   http://www.lacourt.org/casesummary/ui/casesummary.aspx?

There was also testimony concerning a prior lawsuit involving IS West and 900 Capital. Kaplan acknowledged that he was aware that there had been a prior lawsuit with 900 Capital, which Johnson had settled by obligating IS West to pay $54,000 at no interest over a three-year period of time. Kaplan clarified that he did not have any knowledge of the nature of the 900 Capital suit (which was lost in 1997 or 1998), he never saw the complaint and does not even know whether IS West was a party to that suit. Kaplan signed the settlement checks on that suit sometime between 2001 and 2004 because Johnson told him that it was the only way to settle in that Johnson did not have any money and IS West did, so IS West would have to pay.

Kaplan also testified that the 900 Capital settlement was done without Kaplan's knowledge or consent, but Johnson later agreed that when they sold IS West, Johnson would "true up on it" with Kaplan, which the Court takes to mean that Johnson would take a smaller percent of the sales price so that Kaplan would receive more.

As to the Cleveland/Bickley litigation, Kaplan testified that because Johnson said that it would be more cost effective for IS West and Johnson to have one attorney representing both of them, Kaplan signed a waiver of conflict for that attorney. But Kaplan asserts that he did not confer with IS West's corporate counsel, he did not ask for or receive updates, and he was not included in correspondence between the attorney and Johnson.[6]   Both men agree that Johnson did not give Kaplan regular updates on the litigation, but Johnson did tell Kaplan of major events and told him of the demurrers and in 2007 advised him that the suit had been thrown out due to the statute of limitations.

---

[6] On direct examination, Kaplan said that he did not receive any correspondence from Neufeld (the litigation counsel representing IS West and Johnson). However, on cross-examination he testified that in 2006, in the beginning of the case, he would periodically be copied by Neufeld on some things, but he later found out that he was not copied on everything. He testified that he never was sent copies of statements under penalty of perjury.

On June 20, 2007, after reading a response [apparently on behalf of Cleveland/Bickley] to something in the Cleveland/Bickley lawsuit, Kaplan sent Johnson an email (copies to Timothy Neufeld, Alison Maker, and Yuriko Shikai) discussing the merits and strategy of the suit.  In this e-mail he asks "[a]re there cases where you have the same owners of like businesses, with one going out of business and the other surviving where investors were not entitled to money from the company that survived?" He then posits defenses based on the failure of ISI to give Cleveland stock, the delay in IS West turning a profit due to the excessive financial losses of The Central Connection, and the value of consideration paid by IS West for the assets of ISI, etc. [7]

At some point in the Cleveland/Bickley litigation, Kaplan was deposed, apparently as the person most knowledgeable about IS West. But he testified that the deposition did not make him feel that IS West might be liable as it dealt mostly with the finances of the company and his involvement in growing the company.  And, although he attended the trial on the advice of trial counsel, Kaplan did not attend any of the other court hearings in the Cleveland/Bickley lawsuit.

In or about November 2010 Kaplan received a letter from Timothy Neufeld, the state court counsel for IS West and Johnson, stating that Johnson was $250,000 behind in legal fees and that Neufeld would withdraw unless those fees were paid.  This was within sixty days of the trial and, according to Kaplan, was the first communication that Kaplan received from Neufeld.  Upon receipt of this letter, Kaplan called IS West's corporate counsel, who threw out a variety of solutions, which Kaplan rejected.  Kaplan demanded that Johnson pay the fees, but Johnson refused and said that he was out of money.  Ultimately Kaplan agreed to have IS West pay the fees and apparently IS West

---

[7] Exhibit 100 , contained as page 1 of Trustee's exhibit I, §30.

paid $40,000 in or about November 2010.  When judgment was entered on behalf of

Cleveland and Bickley against both Johnson and IS West, Kaplan insisted that Johnson

pay it, but Johnson refused.

Ultimately, close to $5 million was paid from the IS West estate to

Cleveland/Bickley.  The Court also takes judicial notice that the firm of which Mr.

Neufeld is a part filed a proof of claim in the IS West case for about $621,000, showing

that it had received about $530,000, almost all of which was paid prior to September

2010.  The Trustee stipulated with the Neufeld firm that resulted in the waiver of any

claims against the Neufeld firm, the firm's insurance carrier paying $70,000 to IS West's

estate, and the Neufeld firm waiving its claim for unpaid fees and costs except for the

sum of $15,323.76, which was paid in full under the IS West confirmed plan (1:12-bk-

20897-GM, claim #9, dkt. ##468, 518).

## LEGAL DISCUSSION AND CONCLUSIONS

### I.  BURDEN OF PROOF

When a proof of claim is filed, it is deemed allowed unless a party in interest

objects.  11 U.S.C. §502(a).  Federal Rule of Bankruptcy Procedure 3001 governs the

form and evidentiary effect of a proof of claim and provides that a "proof of claim

executed and filed in accordance with these rules shall constitute prima facie evidence

of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f).  Because Kaplan's

claim is not based on a writing, no security interest is asserted, and it is not for

consumer credit, the minimum requirement is that it be a written statement setting forth

the claim and that it substantially conform to the official form.  This claim meets those

requirements.  This initially shifts the burden of proof to the objector:

The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "*prima facie*" valid. In re Holm, 931 F.2d 620, 623 (9th Cir. 1991) (quoting 3 L. King, *Collier on Bankruptcy* § 502.02, at 502-22 (15th ed. 1991)). In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case. Id.; *see* In re Windsor Communications Group, Inc., 45 Bankr. 770, 773 (Bankr. E.D. Pa. 1985). In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. *See* In re WHET, Inc., 33 Bankr. 424, 437 (Bankr. D. Mass. 1983). The burden of persuasion is always on the claimant. Holm, 931 F.2d at 623 (quoting *Collier* § 502.02, at 502-22); Windsor Communications, 45 Bankr. at 773.

In re Allegheny Int'l, Inc., 954 F.2d 167, 173-4 (3d Cir. 1992).

While bankruptcy law governs the form and content of the claim, nonbankruptcy law governs the substance of the claim.  Butner v. United States, 440 U.S. 48 (1979). The Trustee has the initial burden of proof on at least one issue – at this point in the case the issues under consideration are whether the statute of limitations ran prior to the filing of Johnson's bankruptcy case and/or the claim is derivative and belongs to the estate rather than to Kaplan.  Further, since the issues considered in this memorandum - statute of limitation and the derivative rule - are both pled as defenses, even under California procedural law, the burden of proof is on the Trustee with respect to both issues. *See, e.g.,* California Sansome Co. v. U.S. Gypsum, 55 F.3d 1402, 1406 (9th Cir. 1995); O'Connor v. Boeing North Am., Inc., 92 F. Supp. 2d 1026, 1037 (C.D. Cal. 2000), *rev'd in part on other grounds*, 311 F.3d 1139 (9th Cir. 2002); Samuels v. Mix, 22 Cal. 4th 1, 7 (Cal. 1999); Draper Fisher Jurvetson Mgmt. Co. V, LLC v. I-Enterprise Co. LLC, 2004 U.S. Dist. LEXIS 32065 (N.D. Cal. Dec. 15, 2004).

## II. STATUTE OF LIMITATIONS

The issues before the Court are (1) the length of the statute of limitations, (2) when the statute of limitations begins to run, and (3) whether the running of the statute of limitations has been postponed in this case.

The claim brought by Kaplan is based on state law and thus state law determines both the length of the limitations period and the point at which the statute begins to run.

When the statute of limitations on a claim has expired prior to the filing of the bankruptcy, that claim is barred from recovery in the bankruptcy case. Banks v. Gill Distribution Centers, Inc. (In re Banks), 263 F.3d 862 (9th Cir. 2001). Thus, the Court must determine whether a claim asserted at the instant of the filing of the bankruptcy case would be barred by the statute of limitations if it had been brought in a California court.

### A. Length of Statute of Limitations

The Kaplan POC implies two theories of recovery – fraud and breach of fiduciary duty. As noted above, all statutes of limitation are set by California law.

For fraud or deceit, the statute of limitations is three years. Cal. Civ. Proc. Code §338(d).[8]

The Trustee has cited a number of recent California decisions holding that where the gravamen of a claim for breach of fiduciary duty is fraud, the claim should be governed by the three-year statute of limitations under Cal. Civ. Proc. Code §338(d)

---

[8] Cal. Civ. Proc. Code §338(d) provides a three-year statute of limitation for an action "for relief on the ground of fraud or mistake. The cause of action in that case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."

rather than the four-year catch-all limitations period of §343 that would otherwise be applicable to claims for breach of fiduciary duty. American Master Lease LLC v. Idanta Partners, Ltd., 225 Cal. App. 4th 1451 (Cal. Ct. App. 2d Dist. 2014); Fuller v. First Franklin Fin. Corp., 216 Cal. App. 4th 955 (Cal. Ct. App. 3d Dist. 2013); Thomson v. Canyon, 198 Cal. App. 4th 594, 607 (Cal. Ct. App. 1st Dist. 2011). Kaplan has not argued to the contrary.

The Court finds that the applicable statute of limitations is three years. The issue is when the cause of action accrued to trigger the beginning of the statute of limitations period.

### B.  When Does the Statute of Limitations Begin to Run?

This should be a fairly easy question to answer, but the introduction of federal case law into the papers has made it more complex.  In part this is because each statute cited seems to have its own formulation for determining the beginning of the statute of limitations.  For example, Beneficial Standard Life Ins. Co. v. Madariaga, 851 F.2d 271, 274-5 (9th Cir. 1988), which concerns a RICO claim, notes:

> Agency Holding explicitly left open the question of when RICO claims accrue. 107 S. Ct. at 2767. Before Agency Holding, the general federal rule was "that the limitations period begins to run when the plaintiff knows or has reason to know of the injury which is the basis for his action." Compton, 732 F.2d at 1433. This rule was in force when the district court ruled on the summary judgment motion. There is a question, however, whether this rule or the accrual rule applicable to antitrust suits should now apply. In other actions governed by 15 U.S.C. § 15b, the plaintiff's knowledge is generally irrelevant to accrual, which is determined according to the date on which injury occurs. Airweld, Inc. v. Airco, Inc., 742 F.2d 1184, 1189-90 (9th Cir. 1984), cert. denied, 469 U.S. 1213, 84 L. Ed. 2d 331, 105 S. Ct. 1184 (1985).

As much as the Trustee would like to apply the discovery rule to this case so that the statute of limitations began to run no later than December 2005, under California

law the accrual rule applies.

### 1. The Statute of Limitations Begins to Run When All Elements of the Cause of Action Have Accrued

Under California law, a cause of action does not accrue and the limitations period does not begin to run until all elements of the cause of action have accrued. The term "accrue" is defined as

> To come into existence as an enforceable claim or right; to arise <the plaintiff's cause of action for silicosis did not accrue until the plaintiff knew or had reason to know of the disease>. . . . "The term 'accrue' in the context of a cause of action means to arrive, to commence, to come into existence, or to become a present enforceable demand or right. The time of accrual of a cause of action is a question of fact." 2 Ann Taylor Schwing, California Affirmative Defenses § 25:3, at 17–18 (2d ed. 1996).

Black's Law Dictionary, 9th Ed. 2009. Thus, the first question is when did all elements of the causes of action exist, thus triggering the statute of limitations.

For the statute of limitations to begin to run on Kaplan's fraud claim all of the necessary elements of a fraud cause of action must have occurred: "(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage. " Molko v. Holy Spirit Assn., 46 Cal. 3d 1092, 1108 (Cal. 1988). "The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach." City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 68 Cal. App. 4th 445, 483 (Cal. Ct. App. 1st Dist. 1998). Thus, for either cause of action to accrue Kaplan must have suffered damage, which is defined as "actual and appreciable harm":

> We conclude from the above decisions that although a right to recover nominal

1
2
3

damages will not trigger the running of the period of limitation, the infliction of appreciable and actual harm, however uncertain in amount, will commence the statutory period. Under present authority, neither uncertainty as to the amount of damages nor difficulty in proving damages tolls the period of limitations.

4

<u>Davies v. Krasna</u>, 14 Cal. 3d 502, 514 (Cal. 1975).

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

      The <u>Davies</u> court cited <u>Walker v. Pacific Indem. Co.</u>, 183 Cal. App. 2d 513, 517 (Cal. Dist. Ct. App. 1st Dist. 1960), which involved a motorist who requested a $50,000 policy from his insurance broker, but the broker wrote the policy for $15,000.  When an accident occurred, the insurance company paid $15,000 of the $100,000 judgment for personal injuries and the insured's assignee sued the broker for the additional $35,000 that should have been covered by the policy.  The court found that the action actually accrued when the verdict for $100,000 was returned, not when the insured became aware that the policy was in the wrong amount.  This was because the insured sustained no injury until there was a judgment in excess of the $15,000 policy limit. Prior to that time, the insured could not even have brought an action against the broker for nominal damages: "Until judgment in the personal injury action, no liability was imposed upon the insured as to which he could allege a cause of action against the broker from whom he had ordered indemnity in excess of that furnished."  <u>Id.</u> at 518.

20
21
22

      <u>Davies</u>, <u>Walker,</u> and their progeny require a "compensable" injury before the cause of action for fraud accrues.

23
24
25
26
27
28

      <u>Crowley v. Peterson</u>, 206 F. Supp. 2d 1038 (C.D. Cal. 2002), provides an excellent analysis of California law in light of <u>Davies</u> and of <u>Walker</u> as well as other cases that followed these precedents.  It concludes that "the 'actual and appreciable harm' test must be interpreted in a manner consistent with the traditional rule that any compensable injury, however slight, will commence the statutory period of limitations." <u>Id.</u> at 1047.  Although not specifically defined, the concept of a "compensable" injury is

one that gives rise to a legal remedy.

The Court has reviewed the cases cited by the Trustee and finds that in general they rely on federal rather than state law or their facts are inapplicable to the situation before this Court.  Berry v. Valence Tech. Inc., 175 F.3d 699 (9th Cir. 1999), and the cases that it relies on concern actions brought under section10(b) of the 1934 Security Act, which has been codified in 15 U.S.C. § 78j(b).  Although the statute of limitations for civil fraud is not specified in that statute, Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991) (superseded by statute on other issues), determined that in securities fraud cases the statute of limitations is determined under federal law, rather than state law.  It then adopted the language of section 9(e) of the 1934 Act, as codified in 15 U.S.C. § 78i(f) which states, in pertinent part: "No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation."  Thus there is no requirement that damages had to have occurred prior to bringing the suit.  The issue in these securities cases is when did the Plaintiff become aware of the wrongful act and whether that was within three years of the wrongful act having occurred.

The cases cited by the Trustee focus on when the Plaintiff discovered the wrongful act, not when damages occurred.  See, for example, Berry, 175 F.3d at 705 (a general article in a magazine about the health of the corporation did not actually raise suspicion of fraud and therefore the suit was not time-barred); Unpingco v. Hong Kong Macau Corp., 935 F.2d 1043, 1045 (9th Cir. 1991)(the Ninth Circuit applied a Guam statute for fraud, which was based on the California statute of limitations and thus California law, assumed that the cause of action had fully accrued before the plaintiffs

had notice, and therefore never dealt with the questions at issue in this proceeding).

The Trustee also cites to <u>First Interstate Bank of Hawaii v. Hartley</u>, 681 F. Supp. 1457

(D. Haw. 1998), which is a somewhat complex case dealing with both fraud and a

probate limitations overlay as well as the relationship of a subrogee and a subrogor to

the statute of limitations period.  Here the plaintiff knew of the alleged fraud and that it at

least had a contingent claim against the decedent's estate, but it failed to timely file a

claim in the probate and therefore its claim was time barred.

Turning back to the claim of Kaplan in this bankruptcy case, Kaplan first suffered

a compensable injury from Johnson's alleged fraud in about November 2010 when IS

West started paying the costs of defending the Cleveland/Bickley lawsuit, which was to

the detriment of Kaplan's equity interest in IS West.  Until that moment, Kaplan could

not have filed the fraud cause of action or the breach of fiduciary duty cause of action.

Thus the three-year statute of limitations did not start to run until November 2010.


### 2.  Effect of the Discovery Rule


Counsel for Johnson does not present federal law as a basis concerning the

statute of limitations, but cites solely to California cases and argues that the discovery

rule is an exception to the general rule of accrual.[9]   However, Debtor attempts to apply

it to <u>shorten</u> the statute of limitations, whereas the discovery rule can only be used to

<u>lengthen</u> or toll the time within which a plaintiff can file suit.

In <u>Britz Fertilizers, Inc. v. Nationwide Agribusiness Ins. Co.,</u> 2013 U.S. Dist.

LEXIS 144232, at *75-77 (E.D. Cal. Oct. 3, 2013), the District Court gives a thorough

---

[9] The Debtor has a direct interest in the outcome of this objection to claim in that this might be a surplus estate –
largely depending on the amount of the Kaplan claim – and also because Kaplan has filed a §523 complaint which
would be subject to dismissal or curtailment if the statute of limitations bars the claim of fraud that occurred prior
to 2008.

analysis of the very argument made by the Trustee and by Johnson:

> In continuing to argue Britz's fraud claim accrued as soon as Britz became aware in 2002 or 2003 that Nationwide might have made a misrepresentation — regardless of the fact that under the holdings of Butcher, Walker and similar cases, *see, e.g.,* Williams v. Hilb, Rogal & Hobbs Insurance Services of California, Inc., 177 Cal.App.4th 624, 98 Cal.Rptr.3d 910 (2009), Britz suffered no compensable injury as a matter of law until the Skouti judgment was entered against it in 2005 — Nationwide evinces a fundamental misunderstanding of statutes of limitations in general and of the discovery rule in particular. Again, with limited exceptions, "the statute of limitations runs from the occurrence of the last element essential to the cause of action." Aryeh, *supra*, 55 Cal.4th at 1191 (internal citations, quotations omitted). Injury to Britz, the last element essential to Britz's fraud cause of action, occurred in 2005. The discovery rule, "which delays accrual of a cause of action until a party discovers or has reason to discover the cause of action," Fuller v. First Franklin Financial Corporation,    Cal.Rptr.3d   , 2013 Cal. App. Unpub. LEXIS 3119, 2013 WL 2326729 (Cal. App. 3 Dist. 2013), at *4, does not alter the general rule of accrual. The discovery rule may be invoked to postpone the running of the statute of limitations where a cause of action would otherwise have accrued under the general rule if the plaintiff did not suspect and could not reasonably have discovered that the cause of action resulted from wrongdoing. *See* Fox, *supra*, 35 Cal.4th at 803. But Nationwide has provided no authority — and the Court's research reveals no authority — to support the proposition that the rule may be invoked to "jumpstart" the limitations period when all the elements essential to the cause of action have not yet occurred. Nationwide essentially attempts to jumpstart the limitations period in this case by contending the fraud claim accrued once Britz discovered "facts sufficient to make a reasonably prudent person suspicious of fraud," Bedolla v. Logan & Frazer, 52 Cal.App.3d 118, 130, 125 Cal. Rptr. 59 (1975), even though no injury to Britz had even occurred. Problematically for Nationwide, while "the discovery rule may extend the statute of limitations, [ ] it cannot decrease it." Cleveland v. Internet Specialties West, Inc., 171 Cal.App.4th 24, 32, 88 Cal.Rptr.3d 892 (2009).[10]

Johnson directs the Court's attention to the case of Norgart v. Upjohn Co., 21 Cal. 4th 383 (1999), in which the plaintiff sued for wrongful death in that their daughter had committed suicide after overdosing on prescription drugs. An action for wrongful death accrues when a wrongful act has been committed that causes the death of another person. In Norgart, the cause of action fully accrued when the daughter died in 1985. The complaint was filed in 1991, long after the one-year period allowed under the

---

[10] It is interesting to note that Britz relies on the Court of Appeal opinion in Cleveland v. Internet Specialties West, Inc., the very case that resulted in the judgment which created the harm for which Kaplan is seeking redress.

California statute of limitations.  The issue was whether that period could be extended

by use of the discovery rule, not whether the discovery rule could shorten it.  Thus,

although there is an analysis of the use of the discovery rule, factually this case has no

bearing on the Kaplan claim.

Since the causes of action for fraud and for breach of fiduciary duty did not

accrue until Kaplan suffered actual injury and first had a claim for compensable

damages (around November 2010), his claim is not barred by the statute of limitations

as to the assertion of the breach of fiduciary duty, of the initial fraud when Kaplan

invested in IS West, or of later fraud when Johnson is alleged to have promised that he

would pay for the costs of suit and any damages.


III. <u>DERIVATIVE NATURE OF KAPLAN'S CLAIM</u>

The Trustee argues that Kaplan's fraud and fiduciary duty claims are derivative

and barred under releases granted by IS West to Johnson in connection with the IS

West plan.   He asserts that Kaplan's alleged injury is not against Kaplan directly, rather

Johnson's conduct damaged IS West and thus the value of Kaplan's 50% equity interest

in IS West.

The Court finds that Kaplan's fraud claim is not derivative in nature – Kaplan is

not asserting that Johnson committed fraud against IS West, but rather that he

committed fraud against Kaplan.  Kaplan alleges that Johnson's fraudulent conduct

towards Kaplan induced Kaplan to invest time and money in IS West, to Kaplan's

detriment.  Kaplan is seeking to recover damages based on the value of his IS West

shares, but that does not change the nature of his claim.  The derivative cases cited by

the Trustee involve breach of fiduciary duty, not fraud.  <u>Jones v. H. F. Ahmanson & Co.</u>,

1 Cal. 3d 93 (Cal. 1969); <u>Nelson v. Anderson</u>, 72 Cal. App. 4th 111, 124-125 (Cal. Ct.

App. 2d Dist. 1999). <u>Nelson</u> even distinguishes derivative claims from "personal" claims

such as fraud and notes they can arise from the same set of facts:

> The cause of action is individual, not derivative, only " 'where it appears that the injury resulted from the violation of some special duty owed the stockholder by the wrongdoer and having its origin in circumstances independent of the plaintiff's status as a shareholder.' " (<u>Rankin v. Frebank Co</u>., supra, 47 Cal. App. 3d at p. 95, italics omitted.)

> In other words, it is the gravamen of the wrong alleged in the pleadings, not simply the resulting injury, which determines whether an individual action lies. While we agree that in some cases, the same facts regarding injury to the corporation may underlie a personal cause of action, such as intentional infliction of emotional distress, breach of contract, fraud, or defamation, Nelson has not alleged or proved the elements of any such cause of action. (*See, e.g.,* <u>Sutter v. General Petroleum Corp</u>., *supra*, 28 Cal. 2d at p. 531.)

<u>Nelson</u>, 72 Cal. App. 4th at 124-125.

With respect to the breach of fiduciary duty claims, the Trustee correctly argues:

> It is a general rule that a corporation which suffers damages through wrongdoing by its officers and directors must itself bring the action to recover the losses thereby occasioned, or if the corporation fails to bring the action, suit may be filed by a stockholder acting derivatively on behalf of the corporation. An individual [stockholder] may not maintain an action in his own right against the directors for destruction of or diminution in the value of the stock. . . . (*quoting* <u>Rankin v. Frebank Co</u>., 47 Cal. App. 3d at p. 95.)

<u>Nelson</u>, 72 Cal. App. 4th at 124.  Thus, Kaplan cannot bring a breach of fiduciary duty

action against Johnson as an officer or director of IS West.  Such an action can only be

brought derivatively on behalf of IS West, which has waived its claims against Johnson.

Kaplan argues that California law allows shareholders in a closely held

corporation to directly sue other shareholders for injury to the value of their shares,

citing to <u>Jones v. H. F. Ahmanson & Co.</u>, 1 Cal. 3d 93, 112 (Cal. 1969).  This is an

overstatement.

<u>Jones</u> recognizes that, although shareholders generally do not owe fiduciary

duties to other shareholders, there is a limited fiduciary duty of controlling stockholders

to minority stockholders:  "our conclusion [is] that the comprehensive rule of good faith

and inherent fairness to the minority in any transaction where control of the corporation

is material properly governs controlling shareholders in this state." Jones, 1 Cal. 3d at

112; *see also, e.g.,* McCormick v. Fund Am. Cos.*,* 26 F.3d 869, 884 (9th Cir. 1994)("The

duty which is derived from Jones, however, exists only between majority and minority

shareholders.")  Thus, this duty would apply only to actions taken during the period

between November 1997 (when Kaplan acquired 20% of IS West) and November 1998

(when Kaplan became a 50% shareholder).

Furthermore, the Jones decision applied this duty to a manipulative stock

transaction clearly designed to deliver value to the majority at the expense of the

minority.  It distinguished an injury to a corporation as a whole, which may only be

redressed through a derivative suit, from an injury to the value of a minority

shareholder's shares in that corporation, which may be the subject of a suit brought

directly by the aggrieved minority shareholder.  Subsequent cases have applied Jones

to allow direct suits only where the majority shareholder has taken action that

redistributes value disproportionately among shareholders (as opposed to depleting the

value of the corporation as a whole).

> When all was said and done, Pareto's claims were for injury to Barbary Coast
> itself, which ultimately reduced the value of the stock. In other words, the action
> was "derivative, i.e., in the corporate right, [because] the gravamen of the
> complaint is injury to the corporation, or to the whole body of its stock or property
> without any severance or distribution among individual holders." Jones v. H. F.
> Ahmanson & Co., 1 Cal. 3d 93, 106, 460 P.2d 464, 470, 81 Cal. Rptr. 592, 598
> (1969). We recognize that an action may lie both derivatively and individually
> based on the same conduct. *See* Sutter v. General Petroleum Corp., 28 Cal. 2d
> 525, 530, 170 P.2d 898, 901 (1946). Thus, the mere presence of an injury to the
> corporation does not necessarily negate the simultaneous presence of an
> individual injury. Still, the pivotal question is whether the injury is incidental to or
> an indirect result of a direct injury to the corporation or to the whole body of its
> stock or property. *See* Jones, 1 Cal. 3d at 107-108, 460 P.2d at 470-71, 81 Cal.

Rptr. at 598-99. If a corporation suffers a direct injury to the whole of its assets, any corresponding injury to the value of an individual stockholder's shares (assuming the stockholder suffers no truly independent injury), is merely incidental to, or an indirect result of, the direct injury to the corporation's assets. An action by stockholders for that injury must be brought derivatively if at all.

Pareto v. FDIC, 139 F.3d 696, 699 (9th Cir. 1998); *see also* Jara v. Suprema Meats, Inc., 121 Cal. App. 4th 1238, 1257-1258 (Cal. Ct. App. 1st Dist. 2004)(excessive compensation paid to majority shareholder: "we read Jones as allowing a minority shareholder to bring a personal action alleging 'a majority stockholders' breach of a fiduciary duty to minority stockholders,  which resulted in the majority stockholders retaining a disproportionate share of the corporation's ongoing value.' "); Crain v. Electronic Memories & Magnetics Corp., 50 Cal. App. 3d 509, 522 (Cal. Ct. App. 4th Dist. 1975)(manipulative stock transaction by majority: "The Jones court held that a majority shareholder may not use its power to control corporate activities for its benefit alone, or in a manner detrimental to the minority's interests.")

Kaplan asserts two theories for recovery: fraud and breach of fiduciary duty. Kaplan's fraud action belongs to Kaplan personally and is not derivative in nature. Thus, it is not barred by IS West's release of claims against Johnson.  Kaplan's breach of fiduciary duty claim is derivative in nature and does not fall within the limited exception of Jones and its progeny that allow minority shareholders to directly bring such claims against controlling shareholders.  Leaving aside the issue that Kaplan was a minority shareholder for only one year between November 1997 and November 1998, the exception does not allow direct suits for harm to the corporation as a whole. Kaplan's claim asserts just such a breach of fiduciary duty by Johnson that damaged the value of IS West as a whole and thus the value of Kaplan's shares.  And that wrongful action by Johnson occurred before Kaplan was even involved in IS West – it was when Johnson

fraudulently transferred the assets of ISI into IS West. This suit may not be brought by Kaplan directly.

## IV. SUBORDINATION OF KAPLAN'S CLAIM

Kaplan has formally subordinated his claim to the claims of the other unsecured creditors, but this subordination does not end the Trustee's standing to object to Kaplan's claim.  While Kaplan's now-subordinated claim will not dilute distributions to other creditors, it would reduce the payment to Johnson, as equity, of surplus funds from the estate. Under Bankruptcy Code §704(a)(5), the Trustee has a duty to object to any improper claims.  This duty runs to the debtor as well as creditors:

> The United States Trustee has concisely summarized a chapter 7 trustee's duties to others in administering assets of a bankruptcy estate: "[t]he trustee is a fiduciary charged with protecting the interest of all estate beneficiaries — namely, all classes of creditors . . . as well as the debtor's interest in exemptions and in any surplus property." United States Trustee, Handbook for Chapter 7 Trustees (Effective October 1, 2012), pg. 4-2 http://www.justice.gov/ust/eo/private_trustee/library/chapter07/docs/ch7hb2012/Handbook_for_Chapter_7_Trustees.pdf.

In re Wisdom, 478 B.R. 394, 399 (Bankr. D. Idaho 2012). Here the Trustee is carrying out his duty.

## V. CONCLUSIONS

As to the Claims for Fraud, both concerning the initial investment and the promises allegedly made in 2005 – These have been brought within the statute of limitations and are not derivative, but they have been subordinated to the claims of the other unsecured creditors.

As to the Claim for Breach of Fiduciary Duty  - Although this was brought within the statute of limitations, it is derivative, belongs to the Trustee, and has been waived by

1   the Trustee as part of the settlement (1:12-bk-20897-GM, dkt. 360-1, pp.17-18).

2   ###

Date: January 7, 2015

_____
Geraldine Mund
United States Bankruptcy Judge